UNITED STATES OF AMERICA

FEDERAL MEDIATION AND CONCILIATION SERVICE

IN THE MATTER OF THE ARBITRATION BETWEEN

| | | |
|---|---|---|
| District 1199 N.M., National | } | |
| Union of Hospital and | } | FMCS Case No. 15-54679 |
| Healthcare Employees | } | |
| AFCME, AFL-CIO, | } | Termination Grievance |
| Union | } | |
| and | } | |
| Christus St. Vincent | } | Robert H. Monnaville, Esq. Arbitrator |
| Regional Medical Center, | } | |
| Employer | } | |
| | } | |

| | |
|---|---|
| Representing the Union | Mr. James A. Montalbano, Youtz & Valdez, P.C. 900 Gold Avenue Southwest Albuquerque, New Mexico  87102 |
| Representing the Employer | Laurent Badoux Greenberg Traurig, LLP 2375 East Camelback Road, Suite 700 Phoenix, Arizona  85016 |

EXHIBIT 1

## ADMINISTRATION AND PROCEDURE

The National Union of Hospital and Healthcare Employees, and AFSCME, AFL/CIO, District 1199 NM, (the "Union") serves as exclusive bargaining representative for a bargaining unit of employees who work for Christus St. Vincent Regional Medical Center ("CSVRMC") in Santa Fe, New Mexico. (The "Employer"). The Union and the Employer (the "Parties") submitted this dispute to Arbitration under their November 1, 2012 through and including September 30, 2015 Collective Bargaining Agreement (the "Agreement"), a copy of which they introduced at the hearing as joint exhibit 17 ("Jt." 17). The parties selected me to arbitrate this dispute by mutual agreement.

The Grievance in this case arose from the termination of Juanita Trujillo (the "Grievant").

The hearings took place at a neutral site in Santa Fe, New Mexico and were bifurcated on the following dates: October 6, 2015 and January 12, and 13, 2016. At the beginning of the hearings, the parties agreed that the Grievance was properly before me for a final and binding decision on the merits. The parties agreed that I would retain jurisdiction to aid in the implementation of the remedy should I rule for the Union. Either party may invoke my jurisdiction to address remedy issues for sixty days after I issue my award, and I will then retain jurisdiction until the dispute is resolved either by agreement of the parties or my ruling.

The three days of hearings proceeded in an orderly manner. The advocates did an excellent job of presenting their respective cases. A court reporter transcribed the hearings on January 12, and 13, but not October 6, 2015. The court reporter made a copy of transcript available for the parties and to me. Each party had a full opportunity to call witnesses, to make arguments and to introduce documents into the record. Witnesses were sworn under oath and subject to cross examination by the opposing party. The parties submitted seventeen joint exhibits and six employer exhibits. A total of eight witnesses testified at the hearing, including the Grievant. At the close of the testimony, the parties agreed to set a mutually agreeable deadline and submit post-hearing briefs by simultaneous submission to me and to each other postmarked by that deadline. By agreement of the parties and concurrence by me, the deadline was extended once. I received the briefs, postmarked by the extended deadline of April 12, 2016 and closed the record on April 18, 2016.

1

## ISSUE TO BE RESOLVED

Did the employer have just cause to terminate the Grievant's employment? If not, what is the appropriate remedy?

## PERTINENT ARTICLES OF THE COLLECTIVE BARGAINING AGREEMENT

The agreement contains the following pertinent provisions.

3. Article 3 – Management Rights

3.1. [...] the responsibilities reserved to the exclusive discretion of CSVRMC include, but are not limited to, the following:

3.1.1. Determination of the size, nature and scope of CSVRMS's business;

3.1.2. Decisions as to the operations to be conducted and the services to be provided at any CSVRMC owned or operated facility or any unit, department, division or part thereof;

***

3.1.6. Decisions as to the number of associates, location and relocation of work, and the type and amount of work that will be performed within any CSVRMC owned or operated facility or any unit. Department, division or part thereof;

***

3.1.8. Decision as to the scheduling of associates, number of shifts, and normal starting and stopping times;

3.1.9. Decision as to whether overtime work will be assigned, the amount of any such overtime work, the numbers of associates to be assigned, and the selection of which associates will be assigned to work, provided that if management decides to institute any change in overtime assignment policy impacting all associates covered by this Agreement, management will provide at least 10 days advance notice of same to the Union in which the Union may demand to bargain over the change;

2

\*\*\*

3.1.11. Adoption and implementation of new policies, work rules, procedures and regulations, as well as the modification or amendment of existing policies, work rules, procedures and regulations;

3.1.12. Decisions concerning the hiring, termination, assignment, transfer, demotion and promotion of associates;

3.1.13. Decisions concerning the establishment, maintenance and enforcement of productivity and efficiency standards;

3.1.14. Decisions as to the skill, ability, qualifications, training and experience that may be required in order to perform work;

3.1.15. Ability to judge skills, ability and performance of each associate

3.1.16. Decisions concerning the counseling, reprimanding, discipline and discharge of associates for just cause with the specific understanding that any discipline must be for just cause and that the Union may grieve and arbitrate any such decisions under this Agreement[.]

## 25. Article 25 – Discipline and Discharge

25.1. Subject to the Management Rights in Article 3, disciplinary actions for non-probationary associates are based on just cause.

25.2. Any supervisor may take disciplinary action against an associate pursuant to the supervisor's authority and consistent with departmental policies. Copies of any documented disciplinary action shall be furnished to the Human Resources office for placement in the associate's file with the signature of the associate acknowledging receipt of the action.

\*\*\*

25.5. A non-probationary associate shall be progressively disciplined for unsatisfactory work performance whenever practical. Each case of inadequate performance or act of misconduct shall be judged individually. The step of

corrective action used will depend on the severity of the infraction and the associate's previous work record. Under certain circumstances suspension without pay, demotion, or dismissal may be the appropriate initial disciplinary action.

25.6. Disciplinary actions include written reprimands, suspensions, demotions, and dismissal. An associate may attach a written response to any disciplinary action documented in the associate's personnel file. An associate wishing to grieve a disciplinary action involving suspensions, demotions, and dismissals may grieve pursuant to the Grievance and Arbitration Procedure contained in this agreement.

***

25.8. Management will attempt to complete investigations within ten (10) business days from the date the associate is placed on administrative leave. The Union Chapter Vice President will be notified if the investigation cannot be completed within ten (10) business days from the date the associate is placed on administrative leave.

## 26. Article 26 – Grievance and Arbitration

26.1. The purpose of this procedure is to secure at the lowest possible level, mutually satisfactory resolutions to grievances, which may arise during the term of this Agreement and are subject to resolution under this Agreement.

26.2 A grievance is defined as a charge by either party to this Agreement that the other has violated one or more expressed provisions of this Agreement or a formal disciplinary action taken against a non-probationary associate whom the grievant alleges was taken without just cause.

***

26.14. Grievances shall be presented as outlined below:

26.15. Step One – A bargaining unit associate who believes that he/she may have a grievance shall contact his/her Union Representative. The Union Representative shall file a written grievance with the associate's immediate supervisor or the level at which the grievance occurred, with a copy to Human Resources (HR) that a potential grievance exists and shall schedule a meeting,

4

during which the parties will attempt to resolve the grievance. The meeting with the supervisor/administrator should be held within five (5) days of the filing of the grievance. Within five (5) days of the meeting, the immediate supervisor will submit a written response to the associate and Human Resources. If the matter is not resolved to the satisfaction of the grievant upon review of the written response, the grievant may file a written grievance at Step Two. Resolution of matters raised at Step One shall not be binding upon CSVRMC as a past practice or interpretation of this Agreement.

26.16. Step Two – Within five (5) days of receiving the written response in Step One, the written grievance must be filed with the associate's next level of supervision, Director or VP, whichever is applicable, with a copy to Human Resources. The Union Representative should schedule a meeting with the Director or VP. This meeting should be held within five(5) days following receipt of the grievance, to discuss the grievance and attempt a resolution. Within five (5) days of the meeting, the Director or VP will submit a written response to the associate and Human Resources. If the matter is not resolved to the satisfaction of the grievant upon review of the written response, the grievant may file a written grievance at Step Three.

26.17. Step Three – Within five (5) days of receiving the written response to Step Two, the written grievance must be filed with the Human Resources Vice President or designee. The Union Representative will schedule a meeting with the Vice President of Human Resources or designee. This meeting should be held within five (5) days following receipt of the grievance, to discuss the grievance and attempt a resolution. Withing five (5) days of the meeting, the Vice President of Human Resources or designee will submit a written response to the associate. If, in the opinion of the associate or the Union Representative, a satisfactory settlement is not obtained within five (5) days of the date of the Vice President of human Resources or designee's response, the associate or Union Representative may advance to arbitration.

***

26.19. Step 4 – ARBITRATION

***

26.19.3    The Arbitrator shall consider the factors of the grievance in

5

arbitration and following the hearing shall prepare and submit to the parties, in writing, a report and decision within thirty (30) calendar days after the conclusion of the hearing. Arbitration shall be conducted according to the rules established by the FMCS (Federal Mediation and Conciliation Service) The Arbitrator shall apply a preponderance of the evidence standard in all cases.

     26.19.4    The parties shall share the cost of services of the Arbitrator equally. Each party will be responsible for compensating its own witness and representatives.

     26.19.5.    The Arbitrator shall have the authority to determine if there was just cause for any disciplinary action. However, in no case shall the Arbitrator have the power to add to, nor subtract from, or modify this Agreement, nor shall the Arbitrator substitute their discretion for that of the employer where such discretion has been retained by the employer, nor shall the Arbitrator exercise any responsibility or function of the employer, including but not limited to, the ability to set standards of patient care.

     26.19.6.    The Arbitrator's award in disciplinary cases is limited to back pay and/or reinstatement, or reinstatement to a similar position at the parties' discretion if irreconcilable conflict exists. Conditions of the reinstatement whether to the associate's original unit, or a different unit, will be handled on a case-by-case basis with input from both management and the Union. The award shall be limited to the amount of wages and benefits the associate otherwise would have earned subject to discount based on any earnings or compensation received by the grievant during the time he/she last worked for CSVRMC including, but not limited to, unemployment insurance benefits. The associate has an obligation to mitigate their damages. The arbitrator may not award attorney's fees, punitive damages, general compensatory damages, or costs.

## BACKGROUND

     Prior to May, 2014, Patrick Salas, RN (the "Director" or "Salas") was appointed Director of the CCU/ICU. He is a well educated, experienced hard charger who had been assigned the task of raising the level of efficiency, proficiency and patient satisfaction in the CCU/ICU Department. The Department had fallen below the Hospital's standard of care and best practices.

6

Juanita Trujillo, the Grievant, was a long term hospital employee who had been hired in October, 1989. Her job title is Monitor Tech II. Her job description is:

"Assists nursing staff by transcribing physician orders. Continuously observes documents, and reports the cardiac rhythm status in the units and/or on telemetry. Performs clerical duties insuring accuracy of unit records. Serves as communication center for nursing unit. Precepts and orients new M.T.'s and nurses to the telemetry monitors and protocols."

The Grievant and the Director's work relationship deteriorated over time. The Director felt that her work product and general behavior had become inconsistent over the last six months of 2014. According to the Director, she failed to follow medical orders correctly and was casual in complying with directives from the medical and nursing staff.

The Grievant had twenty-five years experience at performing her job and felt she was a loyal and productive member of the medical community. She was irritated by the unflattering nickname the Director had given to her ("Pepita meaning small dog"). He criticized her for not answering the telephones at the nurse's station within three rings even if she was not present at the time and determined that she took over three minutes to use the bathroom which was longer than any other employee in the unit. It troubled her that other women on the staff had reported him to Human Resources.

An incident took place in May of 2014 in which the Grievant called the hospital staffing office to resolve a staffing issue on a ward to which she was transporting a patient. Mr. Salas became irate that the Grievant did not use the chain of command. The Grievant and Mr. Salas had a loud confrontation over the issue. After she had left the hospital at shift's end, Mr. Salas continued the confrontation by calling her twice on her cell phone to express his displeasure and again the following morning on her day off.

Mr. Salas' displeasure was evident by his poor annual evaluation of the Grievant in August, 2014 and his ordering the Grievant to complete a thirty day Individual Success Plan ("ISP"). The Grievant successfully completed the plan.

The Grievant received her first warning in an otherwised unblemished employment record for an incident that took place on October 14, 2014.

7

A traveling nurse (a thirteen week contract employee) requested that the Grievant, "when she had time", go to the hospital blood bank and retrieve blood for a patient on the unit. The patient had been diagnosed with an infection. Before that patient could receive antibiotics, it was imperative that he be transfused with blood. The status of the patient/medical situation was in hospital parlance "STAT". The Grievant was not told that the patient had been diagnosed with a serious condition and that time was of the essence in retrieving the blood. Because blood is refrigerated, hospital operating procedure mandates that blood be retrieved within thirty minutes of making the request to the hospital blood bank.

As the Grievant proceeded down the hallway on her way to the blood bank, she heard: "Juanita, help me". As she turned in the direction of the caller, the Grievant saw Rebecca, a certified nurse assistant ("CNA") struggling mightily with a highly agitated patient thrashing around half in half out of the restraints holding him in the bed. The upper restraints were undone and the lower restraints were the only thing supporting the CNA's efforts to contain the patient. As the Grievant approached the hospital room, the CNA advised the Grievant that the patient had a critical/mainline as well as one IV tube attached to his body. It is significant to note that had the critical/mainline ruptured or been yanked from the patient's body, the chances of the patient "bleeding out" becomes a realistic possibility. The patient was a heavy well defined young adult male. While helping the struggling CNA to secure the patient back in his bed, the Grievant yelled out for help. A nurse arrived at the door and after accessing the situation, went to get medication to sedate the patient. The nurse eventually returned and administered the medication. The patient was returned to a secure and safe position in his hospital bed. At this point the charge nurse of the CCU/ICU, Ms. Hand, arrived and inquired whether the Grievant had retrieved the blood. Upon hearing the Grievant's negative response, the charge nurse moved quickly to retrieve the blood herself. For her failure to retrieve the blood in a timely manner, Nurse Hand recommended Ms. Trujillo be given a written warning. Mr. Salas agreed with Ms. Hand's recommendation and Ms. Trujillo received a written warning November 25, 2014.

Ms. Trujillo testified at the hearing that she did not grieve the warning. Her deteriorating relationship with Mr. Salas frustrated and concerned her. She felt it best to "fly under the radar". She wanted to get along by going along.

8

## **FACTS**

With the above mentioned background, we now arrive at the December 14, 2014 incident for which the Grievant was terminated. On that day, the CCU/ICU was chaotic. The patient census was high and the staff moved from crisis to crisis. Because of the situation, the Grievant was asked to work through her lunch break which she did.

The Medical Director of the unit was very concerned about a suicidal patient. He gave the Charge Nurse, Ms. Hand, a medical order that a Sitter be placed in the patient's room. After he left the unit, he called back to confirm that a Sitter had been placed in the room. He was informed that it had not happened yet. Ms. Hand instructed the Grievant to go to the patient's room and sit with her. The Grievant was not aware that the patient was suicidal. She informed Ms. Hand that she was updating patient's charts. Ms. Hand advised her to finish what she was doing and then go to the patient's room.

The Grievant did as she was instructed. The Grievant testified that she arrived in the suicidal patient's room approximately ten minutes after being instructed to do so by the Charge Nurse. Also in the patient's room was the patient's significant other and the patient's parents who were coming and going from the room periodically through out the day.

Ms. Hand testified that the Grievant did not arrive at the patient's room until 5:30 p.m., forty-five minutes after the Grievant received the order to be a Sitter. In support of this allegation, Ms. Hand relied on computer records which indicated that the Grievant had logged in at a terminal near the patient's room at 5:30 p.m. The Vice-President of Human Resources testified that the computer records were unreliable and could not be used to verify the time the Grievant entered the suicidal patient's room.

No one on the hospital staff advised the Grievant that the patient was suicidal. Nor was it posted on the wall board at the nurse's station. However, after she entered the patient's room, the patient told the Grievant that she was suicidal.

The hospital has a written policy/procedure/protocol spelling out exactly what must take place if a physician writes an order for a Sitter to be placed in

9

the room of a patient who has been diagnosed suicidal. The Grievant testified that she was unaware of the hospital's policy. She had never been trained to understand that it was hospital policy that a Sitter never leave a suicidal patient alone.

When the Grievant entered the patient's room, the patient indicated that she was cold and wanted a blanket. The closet containing the blankets was across the hall from the patient's room. The Grievant made sure the door was securely open, that the curtain was completely pulled back and that the significant other would remain in the room while the Grievant retrieved the blanket. The Grievant went the short distance to the closet and retrieved the blanket. The Grievant testified she was out of the room between 30 seconds and a minute.

The patient also requested water. The Grievant accommodated her request. She stepped down the hall and retrieved water for the patient. While the Grievant was out of the room fetching the water, the patient's significant other and both parents remained in the room with the patient.

The remainder of the shift was uneventful. Nothing was said to the Grievant about her job performance that day and she continued to perform sitting assignments thereafter until she was terminated in mid January, 2015.

## DISCUSSION

Employer's Position

The Employer argues that it has proven by a preponderance of the evidence that the Grievant was properly terminated for just cause pursuant to Article 25 of the Collective Bargaining Agreement. Ms. Trujillo repeatedly violated the hospital's policies and twice placed the safety and well-being of critically ill patients in jeopardy. In both cases she had been ordered by a nurse to carry out a physician's order. In both incidents, the Grievant either failed to complete the assignment or violated hospital policy in the execution of the order. The Grievant had received a written warning for the first of the two incidents.

Further, the Employer judged her conduct as reckless because she had ignored the hospital's warning given to her by a poor annual review in August,

10

2014. Her supervisor had counseled her through an Individual Success Plan (ISP). Having been adequately warned that her conduct was unacceptable, the hospital was particularly concerned that the Grievant did not cease and desist her casual attitude and her sloppy performance. Her lack of regard for the impact of not following the orders of medical personnel after having been given a warning for a prior incident was sufficient to result in termination for the same violations in the second incident.

The Grievant's lack of concern for care of a critically ill patient diagnosed with suicidal tendencies was unacceptable. The rule is vital for the safety of high risk patients and must be adhered to. Ms. Trujillo was instructed per hospital policy not to leave the patient unattended. The Grievant broke the rule that a Sitter cannot leave a patient unattended. Therefore the hospital had just cause to terminate her.

The hospital argues that the Human Resources Department investigated both incidents thoroughly before it made the decision to terminate the Grievant. The investigation was comprehensive, fair and objective. The investigation of the December incident proved conclusively that the Grievant had disobeyed hospital policy and put the patient in jeopardy. This is true because the Grievant admitted that she left the patient twice, once to retrieve a blanket and once to get the patient water.

The hospital rejects any argument that the Grievant was treated unfairly, that her supervisor was "out to get" her or that she was discriminated against for any reason. The investigation of the incidents was thorough and conducted in the same manner as other disciplinary investigations. As an extra procedural safeguard, the hospital's Vice President of Human Resources conducted her own review of the investigation, documentation, witness statements and reports of grievance step meetings to insure that the Grievant received due process.

In summary, the Employer argues that the Grievant had been warned of her sub-par actions and her careless regard for hospital policy. She had been given substantial opportunity to remodel her behavior through the individual success plan (ISP) and counseling by her supervisor. Her behavior risked the safety and well-being of patients and reduced the proficiency and efficiency of the hospital's mission. Her conduct was investigated comprehensively, objectively and fairly. Her defenses during the multi-step grievance procedure

11

gave the hospital the impression that she did nothing wrong under the circumstances or that she was not aware of the hospital policies although she had been an employee for twenty-five years.

The hospital terminated the Grievant because she left a suicidal patient unattended. She was insubordinate and subjected the hospital to a potentially dangerous situation and serious liability for her actions.

Finally the Employer argues that it was blindsided at the arbitration hearing because the Grievant during her testimony raised defenses and supplemented her narration of both incidents that she never raised during the three steps of the grievance procedure.

Union's Position

The Union's position is that the Grievant was, for twenty-five years an exemplary employee. The Employer's allegations that she deteriorated to a sub-standard monitor tech coincidentally happened with the appointment of a new director of the CCU/ICU Unit. Up until that time, the Grievant's work record was flawless, and received annual reviews that exceeded expectations. Ms. Trujillo was well liked by staff and patients alike. The hospital assigned her as a trainer for emergency medical technicians, firemen and new employees of the hospital in the intricacies of being a monitor tech.

The genesis of the supervisor's animosity towards the Grievant was the May 2014 incident described in the Fact portion of this opinion. In that scenario, the Grievant is accused of stepping outside the chain of command to solve a staffing need and the supervisor was furious that she did so. The supervisor's behavior, tone of voice and aggressive demeanor during the confrontation and subsequent telephone calls frustrated the Grievant. She reported him to Human Resources. After he was "spoken to" about the incident, the Grievant believed that her work was over-scrutinized. She was hounded, unfairly appraised in her annual review, made to perform an unnecessary individual success plan, (ISP), charged with a warning against until now a perfect disciplinary record and eventually terminated.

The Union argued that the termination was fatally flawed because it was based on unsubstantiated allegations and disputed facts. Further the Grievant

12

was charged with violating a hospital policy that she was not aware of, had not been trained in and expected to perform duties that she was not licensed to perform.

The discharge was issued primarily for her actions on December 14, 2014. The October incident was presented in evidence by the Employer to show the Grievant's disregard for the importance of following medical orders related to very sick patients in an exact and timely manner. The Union disagrees. Instead, the Union argues that the October 2014 incident shows the Grievant's quick and decisive action during an emergency that may have well saved the patient's life and prevented a co-worker from suffering a serious injury.

A realistic, fair and objective analysis of the December 14, 2014 incident would show that the Grievant performed her duties as a Sitter that day as she had always done. She was not aware of the hospital's Sitter's policy for suicidal patients. She never left the patient alone. She reported to the room ten minutes after receiving the directive to do so. Ms. Hand gave the Grievant the green light to finish the clerical duties she was in the middle of at the time the order was given. The union argues that with between one and three family members in the room at the time the patient asked for a blanket and some water, it was not unreasonable or imprudent for the Grievant to step out of the room for a very short period of time to accommodate the patient's needs.

**OPINION**

The Just Cause Standard

The Collective Bargaining Agreement provides that the Employer may discharge or suspend an employee for just cause. The parties do not define just cause which is not uncommon in collective bargaining agreements. However, the term has developed a specific meeting in labor arbitration based on numerous arbitration decisions issued over many years under many different collective bargaining agreements in a wide range of industries and employment studies. Arbitration decisions refer to "seven tests" of just cause developed by Arbitrator Carroll R. Daugherty. (See Enterprise Wire Co., 46 LA359; Daugherty: 1966; Moore's Seafood Products, Inc., 50 LA83; Daugherty: 1968)

The seven tests promulgated by Arbitrator Daugherty are:

13

1) Was the employee adequately warned of the consequences of her conduct?

2) Was the employer's rule or order reasonably related to efficient and safe operations?

3) Did management investigate before administering discipline?

4) Was the investigation fair and objective?

5) Did the investigation produce substantial evidence or proof of guilt?

6) Were the rules, orders, and penalties applied evenhandedly and without discrimination?

7) Was the penalty reasonably related to the seriousness of the offense and the past record?

The seven tests have been widely used and also criticized. (see <u>1989 Proceeding of the National Academy of Arbitrators</u>, Chapter 3, p. 23). Leading arbitrators have taken issue with mechanical or automatic application of the seven tests.

In a 1947 arbitration decision, Arbitrator Harry Platt made the following observations about just cause as applied by labor arbitrators in termination cases. Mr. Platt opined that arbitrators must determine whether the employee involved is guilty of wrong doing, and, if so, to confirm the Employer's right to discipline where the exercise is essential to the objective of efficiency. An arbitrator must also be sure to safeguard the interest of a discharged employee by making reasonably sure that the causes of discharge were just and equitable and such as would appeal to a reasonable and fair minded person warranting discharge. To be sure no standard exists to aid an Arbitrator in finding an inclusive answer to such a question. Therefore, perhaps the best an Arbitrator can do is to decide what reasonable men mindful of the habits and customs of industrial life and of the standards of justice and fair dealing prevalent in the community ought to have done under similar circumstances and in that light to

14

decide whether the conduct of the discharged employee was defensible and the disciplinary penalty just. (Riley Stoker Corp. 7 L.A. 764; Platt; 1947.

A common understanding has developed in the field of labor/management relations that just cause requires:

1) Notice to the Grievant of the rules to be followed and the consequences of non-compliance

2) Proof that the Grievant engaged in the alleged misconduct

3) Procedural regularity in the investigation of the misconduct, and;

4) Reasonable and even handed application of discipline, including progressive discipline where appropriate. (See Hill & Sinicropi, Remedies and Arbitration, 2nd Edition (BNA Books; 1991) p. 137-145.

I have considered the facts in this case against the just cause standard as the term is commonly understood in the field of labor/management regulations. The Employer has the right to establish reasonable work performance standards and to require employees to follow the standards. The central issue in this case is whether the Grievant is guilty of wrong doing and if so, was the conduct serious enough to give the employer sufficient reason to impose summary discharge without engaging in progressive discipline.

## DECISION

The issue of whether or not the employer had just cause to terminate the Grievant can be determined by answering the following three questions.

On December 14, 2014:

1) Was the Grievant tardy in complying with the Charge Nurse's order to go to the suicidal patient's room? The answer is no.

2) Was the Grievant qualified to be a Sitter in a suicidal patient's hospital room? The answer is no.

15

3) Did the Grievant by leaving the suicidal patient's hospital room twice jeopardize a patient's safety and give the employer grounds to terminate Ms. Trujillo for just cause? The answer is no.

The Charge Nurse testified that the Grievant was late in arriving at the patient's hospital room. She relied on computer printouts that were unreliable because the computer system was malfunctioning during this period. It is highly unlikely that the Nurse would have tolerated the Grievant not responding to the Doctor's orders for forty-five minutes. The Grievant's testimony is more believable. Ms. Trujillo testified that the Charge Nurse instructed her to go to the patient's room. She advised the Charge Nurse that she was updating patients' charts. The Charge Nurse advised her to clean up the charts that she was working on and then become a Sitter in the suicidal patient's room. The Grievant testified that she arrived at the patient's room ten minutes after receiving the Charge Nurse's order.

Questions two and three above will be addressed simultaneously.

CSVRMC's policy, PC 5.10.3 "Treatment and Services, Sitter's and Attendants, In-house Provisions of Care", which is attached hereto marked as Exhibit A and incorporated by reference. The policy requires that the need for a Sitter be evaluated on a case by case basis. It specifically allows a family member, family friend, significant other, and/or domestic partner may sit with a patient. If a physician orders a Sitter, the primary Nurse will evaluate the patient using the Sitter Criteria Observation Guideline. An example of behaviors that might require a sitter under the guidelines is a suicidal patient. In this case, there was no evaluation of the patient in question using the Sitter Criteria Observation Guidelines. However, if the patient's behavior does meet the guidelines (we will assume in this case that the patient in question would have met the guidelines) the primary Nurse will first engage the family in the decision making about who will sit with the patient (family, family friend, significant other, and domestic partner.) When there is no family available as identified above, the primary Nurse will notify the Nursing Supervisor to request a Sitter from the staffing office. There was no evidence or testimony at the hearing that the policy was followed.

The policy also spells out the procedure for Sitters who sit for patients that

16

meet the Sitter Criteria Observation Guideline. Under number five of the policy's procedure the Sitter may not leave the patient unattended at any time. The Sitter must complete nursing assistant duties and responsibilities with the patient. These duties include:

a) vital signs
b) activities of daily living (feeding, bathing, toileting, ambulating, etc.)
c) turning every two hours
d) documenting vital signs, I&O's and activities

The procedure also mandates that associates who are assigned to sit will be trained and able to demonstrate understanding of CSVRMC's Restraint Policy and Sitter Guidelines.

In the two years that she served as a Sitter prior to December 14, 2014 the employer never trained the Grievant in policy number PC 5.10.3. She had never been told that she was not allowed to leave the patient's room while she was on duty. There was evidence that the Grievant participated on June 27, 2014 in a non-violent crisis intervention training course. The Grievant testified that the training she received did not qualify her in this regard.

The only testimony at the hearing about what happened while she was performing the duties of a Sitter on December 14, 2014 came from the Grievant herself. She testified that she was never told that the patient was suicidal. That information could also be determined by referring to the big board at the Nurse's Station. There was no such comment regarding the patient in question. When the Grievant arrived at her sitting assignment, the patient told the Grievant that she was suicidal. She was adamant in her testimony during the period that was assigned as a Sitter in that room, she never left the patient alone for the remainder of the shift. For the short trip (less than a minute) she made to retrieve a blanket the patient's significant other was in the room at all times. When she went to fetch the water and ice for the patient the significant other and both parents stayed in the room for the few minutes she was away from the room. True the primary Nurse had not consulted with the three family members, but all three were acceptable candidates under the policy to sit with the patient.

Ms. Hand never checked on the patient or the Grievant for the remainder of the shift. The Grievant was not qualified or trained to be a Sitter in that

17

situation. She was not a licensed/certified nursing assistant (CNA). Rebecca, a licensed/certified nursing assistant was assigned to the unit on December 14, 2014. Upon her arrival to work the shift, she was immediately reassigned to float somewhere else in the hospital. The hospital cannot indict Ms. Trujillo for violating a rule of which she was not aware. The situation called for a licensed Certified Nurse's Assistant. Ms. Trujillo does not meet the criteria for that post.

Ms. Trujillo cannot be charged with violating a policy that she was neither aware of nor had been trained in. Nevertheless she never left the patient alone during the entire shift. I rule that the Grievant's actions on December 14, 2014 were reasonable and prudent under the circumstances. She did nothing wrong.

In this case the Grievant did not have notice of the rules to be followed and the consequences of noncompliance. Also there is no proof that the Grievant engaged in the alleged misconduct on December 14, 2014. Finally, even if there had been some misconduct the standard of evenhanded application of discipline would have included progressive discipline such as a second written warning, a final warning or a suspension rather than termination. The employer has the right to establish reasonable work performance standards and to require employees to follow those standards. The central issue in this case was whether the Grievant was guilty of disobedience of proper medical orders given to her, insubordination, and putting patients in danger. I find her innocent of all three charges.

Pursuant to the terms of the Collection Bargaining Agreement, the employer is required to prove by preponderance of the evidence that the Grievant is guilty of wrongdoing. The only witnesses who testified from their own personal knowledge regarding both the October and December incidents discussed above were Nurse Hand and Ms. Trujillo. The only testimony Ms. Hand presented about the October incident is that when she found Ms. Trujillo she was in a patient's room with several other people; the Grievant had not retrieved the blood; that Ms. Hand was not interested in the Grievant's excuses as to why she had not retrieved the blood; and, Nurse Hand decided because of the time restraints to retrieve the blood herself.

Regarding the December incident, Ms. Hand testified that she ordered the Grievant to sit in the patient's room; that the Grievant did not go immediately to the room; and that the computer reports indicate that Ms. Trujillo arrived

18

approximately forty-five minutes later at around 5:30 p.m. Everything else regarding both incidents is learned from the testimony of the Grievant. The Grievant proved to be an excellent witness. She was credible and forthright. Her testimony was never rebutted or contradicted by any witness who had personal knowledge of either the October or December incidents. Accordingly her testimony stands in tact as the only knowledge we have of what took place in both hospital rooms.

**AWARD**

For the reason set forth in the Opinion that accompanies this Award, the Grievance must be and it is hereby sustained. The employer shall:

1) reinstate the Grievant to her former position with full seniority by June 15, 2016; and

2) make the Grievant whole for lost wages and benefits pursuant to Article 26.19.6 of the Collective Bargaining Agreement in effect at the time of her discharge.

I will retain jurisdiction for sixty (60) days from the date of this Award for the sole purpose of aiding the parties in the implementation of the remedy. During that sixty (60) day period, either party may invoke my jurisdiction in writing with notice to the other party. Once jurisdiction is invoked, I will continue to retain jurisdiction until this dispute over the remedy is resolved either through agreement of the parties or by a ruling by me, even if that process takes longer than sixty (60) days.

Dated this, 26th Day of May, 2016

*Robert H. Monnaville*
ROBERT H. MONNAVILLE,
ARBITRATOR                                              19