IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DISTRICT 1199NM, NATIONAL UNION
OF HOSPITAL AND HEALTHCARE
EMPLOYEES, AFSCME, AFL-CIO,

    Plaintiff,

  v.

CHRISTUS ST. VINCENT REGIONAL
MEDICAL CENTER,

    Defendant.

Civ. No. 16-CV-774 MV

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on the Petition to Confirm Arbitration Award and Request for Injunctive Relief filed by Plaintiff District 1199NM, National Union of Hospital and Healthcare Employees, AFSCME, AFL-CIO ("Union") [Doc. 1], and the Motion to Vacate Arbitration Award filed by Defendant Christus St. Vincent Regional Medical Center ("Medical Center") [Doc. 13]. The Court, having considered the petition, the motion, briefs, relevant law and being otherwise fully informed, finds that the Medical Center's Motion to Vacate Arbitration Award [Doc. 13] is not well-taken and will be **DENIED**, and that the Union's Petition to Confirm Arbitration Award and Request for Injunctive Relief are well-taken and will be **GRANTED.**

### I. FACTUAL BACKGROUND[1]

The Grievant, Juanita Trujillo, was a long-time Medical Center employee who had been

---

[1] The factual background is based on the Background section in the Arbitrator's Decision. [Doc. 1-1].

hired in October 1989 and worked as a Monitor Tech II in the Critical Care Unit/Intensive Care Unit ("CCU/ICU"). [Doc. 1-1 at 8]. The job description for Monitor Tech II states:

> Assists nursing staff by transcribing physician orders. Continuously observes documents, and reports the cardiac rhythm status in the units and/or on telemetry. Performs clerical duties insuring accuracy of unit records. Serves as communication center for nursing unit. Precepts and orients new M.T.'s and nurses to the telemetry monitors and protocols.

*Id.*

Prior to May 2014, Patrick Salas, RN, was appointed Director of the CCU/ICU. *Id.* at 7. He was tasked with raising the level of efficiency, proficiency and patient satisfaction in the CCU/ICU Department. *Id.* at 7. The work relationship between the Director and the Grievant deteriorated over time. *Id.* at 8. He believed that her work product and general behavior had become inconsistent over the last six months of 2014, and that she failed to follow medical orders and was casual in complying with directives from the medical and nursing staff. *Id.* The Grievant had 25 years of experience at performing her job and believed that she was a loyal and productive member of the medical community. *Id.* She was irritated that he called her "Pepita" (meaning "small dog"). *Id.* He criticized her for not answering the telephone at the nurse's station within three rings, even if she was not present at the time, and for taking longer than three minutes to use the bathroom, which was longer than any other employee in the unit. *Id.* The Grievant was also troubled that other women on the staff had reported Mr. Salas to Human Resources. *Id.*

In May 2014, the Grievant and Mr. Salas had a loud confrontation over a staffing issue. After she left the hospital at shift's end, Mr. Salas continued the confrontation by calling her twice on her cell phone to express his displeasure and again the following morning on her day off. *Id.* In August 2014, he gave her a poor annual evaluation and required her to complete a 30-

day Individual Success Plan ("ISP").  *Id.*  The Grievant successfully completed the program.  *Id.*

The Grievant received her first warning in an otherwise unblemished employment record for an October 14, 2014, incident.  *Id.*  On that date, a traveling nurse asked the Grievant to go to the hospital blood bank and retrieve blood for a patient on the unit "when she had time."  *Id.* at 9.  The patient had been diagnosed with an infection and, before he could receive antibiotics, it was imperative that he receive a blood transfusion.  *Id.*  The Grievant had not been told that the patient had been diagnosed with a serious condition and that time was of the essence in retrieving the blood.  *Id.*

As the Grievant proceeded down the hallway on her way to the blood bank, a certified nurse assistant ("CNA") called out to her and requested help with a highly agitated patient who was thrashing around half in and half out of the restraints holding him in the bed.  *Id.*  The patient had a critical/mainline as well as one IV tube attached to his body, and there was a danger that the patient might "bleed out" if the critical/mainline ruptured or was yanked from his body.  *Id.*  While the CNA and Grievant were struggling to secure the patient back in his bed, the Grievant yelled out for help.  *Id.*  A nurse arrived, assessed the situation, and went to get medication to sedate the patient.  *Id.*  The nurse eventually returned and administered the medication, and the patient was returned to a secure and safe position in his hospital bed.  *Id.*

At this point, the charge nurse of the CCU/ICU, Cathy Hand, arrived and asked whether the Grievant had retrieved the blood, was told she had not.  *Id.*  Upon hearing this, Ms. Hand moved quickly to retrieve the blood herself.  *Id.*  Based on the Grievant's failure to retrieve the blood in a timely manner, Ms. Hand recommended that the Grievant be given a written warning.  Mr. Salas agreed with Ms. Hand's recommendation and the Grievant received a written warning on November 25, 2014.  *Id.*  The Grievant did not grieve the warning.  *Id.*

On December 14, 2014, the CCU-ICU was chaotic; the patient census was high and the staff moved from crisis to crisis. *Id.* at 10. The Medical Director of the CCU/ICU gave Ms. Hand a medical order that a Sitter be placed in the room of a suicidal patient.[2] *Id.* Ms. Hand instructed the Grievant to go to the patient's room and sit with her. *Id.* The Grievant was not informed that the patient was suicidal. *Id.* She told Ms. Hand she was updating patient's charts; Ms. Hand advised her to finish what she was doing and then go to the patient's room. *Id.* The Grievant testified that she arrived in the patient's room approximately ten minutes after being instructed to do so by Ms. hand. *Id.* Ms. Handtestified that the Grievant did not arrive at the patient's room until 5:30 p.m.—45 minutes after she had been ordered to be a Sitter. *Id.* However, the Vice-President of Human Resources testified that the computer records were unreliable and could not be used to verify the time the Grievant entered the suicidal patient's room. *Id.*

Nobody on the hospital staff advised the Grievant that the patient was suicidal, nor was this information posted on the wall board at the nurse's station. However, when the Grievant entered the patient's room, the patient told the Grievant that she was suicidal. *Id.*

As previously noted, the Medical Center has a written policy/procedure/protocol (the "Sitter Policy") for what must take place if a physician writes an order for a Sitter to be placed in a suicidal patient's room. *Id.* at 10-11. The Grievant testified, however, that she was unaware of the Sitter Policy and had never been trained to understand that it was hospital policy that a Sitter

---

[2] According to the applicable Medical Center Policy, P.C. 5.10.3, "Sitters and Attendants, In-House" (the "Sitter Policy"), when the need for a sitter is identified and/or ordered by the physician, the primary care nurse is to evaluate the patient using the "Sitter Criteria Observation Guideline." [Doc. 13-2 at p. 3]. Examples of behaviors that may require a sitter include violent behavior toward self or others and/or suicidal patients. *Id.* When the patient behavior meets the Sitter Criteria Observation Guideline, the primary nurse will first engage family in decision making about who will sit with the patient. *Id.* If no family is available, the primary nurse will notify the Nursing Supervisor to request a sitter from the Staffing Office. *Id.*

4

should never leave a suicidal patient alone. *Id.* at 11.

When the Grievant entered the patient's room, the patient indicated that she was cold and wanted a blanket. *Id.* The closet containing the blankets was across the hall from the patient's room. *Id.* The Grievant made sure that the door to the patient's room was securely open, the curtain was completely open, and that the patient's significant other would remain in the room while the Grievant retrieved the blanket. *Id.* She testified that she was out of the room for between 30 seconds and one minute. Subsequently, the patient requested water, and the Grievant stepped down the hall and retrieved water for her. *Id.* While the Grievant was out of the room getting the water, the patient's significant other and both parents remained in the room with the patient. *Id.*

The remainder of the shift was uneventful. Nothing was said to the Grievant about her job performance that day, and she continued to perform sitting assignments thereafter until she was terminated in mid-January 2015 pursuant to Article 25 of the Collective Bargaining Agreement. *Id.*

The Union filed a grievance on behalf of the Grievant, and the parties submitted the dispute to arbitration under their November 1, 2012-September 30, 2015, Collective Bargaining Agreement ("CBA"). *Id.* at 2. Hearings on the grievance were conducted on October 6, 2015 and January 12-13, 2016. *Id.*

On May 26, 2016, Arbitrator Robert H. Monnaville ("Arbitrator") issued a decision in favor of the Union and the Grievant and against the Medical Center in FMCS Case No. 15-54679. [Doc. 1-1]. In the decision, the Arbitrator found that the Medical Center did not have just cause to terminate the Grievant. *Id.* He sustained the Grievance and ordered the Medical Center to reinstate Grievant to her former position with full seniority by June 15, 2016, and make the

5

Grievant whole for lost wages and benefits pursuant to Article 26.19.6 of the CBA in effect at the time of her discharge. *Id.* at 20.

The Union filed its Petition to Confirm Arbitration Award and Request for Injunctive Relief on July 5, 2016. [Doc. 1]. The Medical Center thereafter filed its Motion to Vacate on August 1, 2016. [Doc. 13].

## II. THE ARBITRATOR'S DECISION

Noting that the CBA provides that the Employer may discharge or suspend an employee for just cause, the Arbitrator stated:

> A common understanding has developed in the field of labor-management relations that just cause requires:
>
> 1) Notice to the Grievant of the rules to be followed and the consequences of non-compliance;
>
> 2) Proof that the Grievant engaged in the alleged misconduct;
>
> 3) Procedural regularity in the investigation of the misconduct; and
>
> 4) Reasonable and even handed application of discipline, including progressive discipline where appropriate.

*Id.* (citing Hill & Sinicropi, Remedies and Arbitration, 2nd Edition (BNA Books; 1991) p. 137-145.[3] The Arbitrator stated that "[t]he central issue in this case is whether the Grievant is guilty of wrong doing and if so, was the conduct serious enough to give the employer sufficient reason to impose summary discharge without engaging in progressive discipline." *Id.* He further stated:

---

[3] The Arbitrator also referenced the "seven tests" of just cause developed by Arbitrator Carroll R. Daugherty: 1) Was the employee adequately warned of the consequences of her conduct? 2) Was the employer's rule or order reasonably related to efficient and safe operations? 3) Did management investigate before administering discipline? 4) Was the investigation fair and objective? 5) Did the investigation produce substantial evidence or proof of guilt? 6) Were the rules, orders, and penalties applied evenhandedly and without discrimination? 7) Was the penalty reasonably related to the seriousness of the offense and the past record? [Doc. 11 at 14-15, citing *Enterprise Wire Co.*, 46 LA359; Daugherty: 1966; *Moore's Seafood Products, Inc.*, 50 La83; Daugherty: 1968).

6

The issue of whether or not the employer had just cause to terminate the Grievant can be determined by answering the following three questions:

1) Was the Grievant tardy in complying with the Charge Nurse's order to go to the suicidal patient's room?

2) Was the Grievant qualified to be a Sitter in a suicidal patient's hospital room?

3) Did the Grievant by leaving the suicidal patient's hospital room twice jeopardize a patient's safety and give the employer grounds to terminate Ms. Trujillo for just cause?

*Id*. at 16-17. The Arbitrator answered all three questions "no." *Id.*

With respect to the first question, the Arbitrator concluded the Grievant's testimony that she arrived at the suicidal patient's room within 10 minutes of her supervisor's order was more credible than the Ms. Hand's testimony that the Grievant arrived 45 minutes after the order was given, because Mr. Hand relied on computer printouts that were unreliable, as the computer system was malfunctioning at the time. *Id.* at 17.

Regarding the second and third questions, the Arbitrator discussed the Sitter Policy extensively. *Id.* at 17-18, citing Ex. 2. He observed the policy requires that the need for a Sitter be evaluated on a case by case basis, and specifically allows a family member, family friend, significant other, and/or domestic partner to sit with a patient. *Id.* at 17. If a physician orders a Sitter, the primary Nurse is to evaluate the patient using the Sitter Criteria Observation guides. *Id.* The Arbitrator noted that in this case, there was no evaluation of the patient using the Sitter Criteria Observation Guideline, but he assumed that the patient in question would have met the guidelines. *Id.* He stated that the under the guidelines, the primary Nurse is to first engage the family in the decision about who will sit with the patient (family, significant other, etc.). *Id.* When no family is available, the Nurse will notify the Nursing Supervisor to request a Sitter from the staffing office. *Id.* The Arbitrator noted that in this case, there was no evidence or testimony that the policy was followed. *Id.* Additionally, the policy spells out the procedure for

7

Sitters. *Id.* at 17-18. Under the policy's procedure, the Sitter may not leave the patient unattended at any time and must complete nursing assistant duties and responsibilities with the patient, including vital signs, activities of daily living, turning every two hours, and documenting vital signs, I&O's and activities. *Id.* at 18. Associates who are assigned to sit are to be trained and able to demonstrate an understanding of the Medical Center's Restraint Policy and Sitter Guidelines. *Id.*

The Grievant testified that in the two years that she served as a Sitter prior to December 14, 2014, the Medical Center never trained her in the Sitter Policy and she had never been told she that was not allowed to leave the patient's room while she was on duty. *Id.* With respect to the incident at issue, she testified that she was never told by her supervisor that the patient was suicidal, nor was the information posted on the big board at the Nurse's Station. *Id.* When the Grievant arrived at her sitting assignment, the patient informed her that she was suicidal. *Id.* The Grievant testified that she never left the patient alone during the period that she was assigned as a Sitter in the room. *Id.* Ms. Hand never checked on the patient or the Grievant for the remainder of the shift. *Id.*

The Arbitrator found that the Grievant was not qualified or trained to be a Sitter, nor was she a licensed/certified nursing assistant (CNA). *Id.* at 18-19. When the CNA who was assigned to the unit that day arrived to work her shift, she was immediately assigned to float somewhere else in the hospital. *Id.* at 19. The Arbitrator stated:

> The hospital cannot indict Ms. Trujillo for violating a rule of which she was not aware. The situation called for a licensed Certified Nurse's Assistant. Ms. Trujillo does not meet the criteria for that post.
>
> Ms. Trujillo cannot be charged with violating a policy that she was neither aware of nor had been trained in. Nevertheless she never left the patient alone during the entire shift. I rule that the Grievant's actions on December 14, 2014 were reasonable and prudent under the circumstances. She did nothing wrong.

> In this case the Grievant did not have notice of the rules to be followed and the consequences of noncompliance. Also there is no proof that the Grievant engaged in the alleged misconduct on December 14, 2014. Finally, even if there had been some misconduct the standard of evenhanded application of discipline would have included progressive discipline such as a second written warning, a final warning or a suspension rather than termination. The employer has the right to establish reasonable work performance standards and to require employees to follow those standards. The central issue of this case was whether the Grievant was guilty of disobedience of proper medical orders given to her, insubordination, and putting patients in danger. I find her innocent of all three charges.

*Id.* at 19.

Noting that the CBA requires the employer to prove by a preponderance of evidence that the Grievant is guilty of wrongdoing, the Arbitrator stated that he found the Grievant to be a credible and forthright witness, and her testimony was never rebutted or contradicted by any witness who had personal knowledge of either the October or December incidents. *Id.* at 20. The Arbitrator sustained the Grievance and ordered the Medical Center to: 1) reinstate the Grievant to her former position with full seniority by June 15, 2016; and 2) make the Grievant whole for lost wages and benefits pursuant to Article 26.19.6 of the CBA in effect at the time of her discharge.[4] *Id.*

### III. DISCUSSION

#### A. Arbitration Awards Under the Federal Arbitration Act

The Federal Arbitration Act ("FAA" or "the Act"), establishes "a national policy favoring arbitration of claims that parties contract to settle in that manner," and "provides that arbitration agreements in contracts 'involving commerce' are 'valid, irrevocable, and enforceable.'" *Vaden v. Discover Bank*, 556 U.S. 49, 58 (2009) (quoting 9 U.S.C. § 2). *See also*

---

[4] Article 26.19.6 of the CBA gives the Arbitrator the authority to award "back pay and/or reinstatement, or reinstatement to a similar position at the parties' discretion if irreconcilable conflicts exist." [Doc. 1-2 at 6].

9

*Abbott v. Mulligan*, 647 F. Supp. 2d 1286, 1289 (D. Utah 2009) ("The Federal Arbitration Act ('FAA') instituted a national policy favoring efficient resolution of disputes through voluntary arbitration agreements with minimal judicial intervention.").

Section 10 of the FAA provides:

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

    (1) Where the award was procured by corruption, fraud, or undue means;
    (2) Where there was evident partiality or corruption in the arbitrators, or either of them;
    (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
    (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10.

Section 11 of the FAA provides:

In either of the following cases the United States Court . . . wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—

    (a) Where there was an evidence material miscalculation of figures or an evidence material mistake in the description of any person, thing, or property referred to in the award.
    (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
    (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

9 U.S.C. § 11.

As set forth above, the Act "supplies mechanisms for enforcing arbitration awards: a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it."

*Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008). However, the Act significantly limits the Court's discretion when confronted with such an award, requiring that the court "'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11." *Id*.

The Tenth Circuit has explained:

> The courts are not authorized to reconsider the merits of an award *even though* the parties may allege that the award rests on *errors of fact* or on *misinterpretation of the contract.* The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements.

*Local No. 7 United Food and Commercial Workers Int'l Union, Inc. v. King Soopers, Inc.*, 222 F.3d 1223, 1226 (citing *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29 (1987)) (internal quotations and citation omitted) (emphasis added).

In the Tenth Circuit, these enumerated statutory grounds (9 U.S.C. §§ 10-11) are exclusive, with the notable exception of the judicially-created "manifest disregard" standard. *See Abbott v. Law Office of Patrick J. Mulligan*, 440 F. App'x 612, 618-19 (10th Cir. 2011) (explaining the circuit split regarding the "manifest disregard" theory and refusing to "jettison[]" the "manifest disregard" standard in the absence of clear guidance from the Supreme Court indicating that it is not encompassed in the grounds enumerated in § 10). *See also Cessna Aircraft Co. v. Acvorp Indus., Inc.*, 943 F. Supp. 2d 1191, 1195 (D. Kan. 2013) ("In addition to these statutory reasons [enumerated in 9 U.S.C. § 10], the Tenth Circuit allows an award to be vacated when the arbitrators acted in manifest disregard of the law or when the award violates public policy."); *DMA Intern., Inc. v. Qwest Commc'n Intern., Inc.*, 585 F.3d 1341, 1344 (10th Cir. 2009) ("An arbitration award will only be vacated for the reasons enumerated in the FAA, 9 U.S.C. § 10, or for a handful of judicially-created reasons.") (internal quotation marks omitted);

11

*Hosier v. Citigroup Glob. Mkts, Inc.*, 835 F. Supp. 2d 1098, 1102 (D. Colo. 2011) ("Both the Supreme Court and the Tenth Circuit, however, have expressly declined invitations to say whether the manifest disregard standard survives *Hall Street*."). Unless the award is vacated, modified or correct as prescribed by 9 U.S.C. §§ 10-11, "the court must grant such an order" confirming the arbitration award. 9 U.S.C § 9.

For these purposes, "manifest disregard" requires "more than error or misunderstanding with respect to the law." *Cessna*, 943 F. Supp. 2d at 1196 (internal quotation marks omitted). *See also ARW Expl. Corp. v. Aguirre*, 45 F.3d 1455, 1463 (10th Cir. 1995) ("This Court has characterized the manifest disregard standard as willful inattentiveness to the governing law" and "[m]anifest disregard of the law clearly means more than error or misunderstanding with respect to the law.") (internal quotation marks omitted). Accordingly, for this Court to vacate an arbitration award on these grounds, the Court must find that the arbitrator "*knew the law and explicitly disregarded it*." *DMA Int'l*, 585 F.3d at 1344 (internal quotation omitted) (emphasis added).

"Notably, the manifest disregard standard applies only to conclusions of law, not to the arbitrators' factual findings, *which are beyond review*." *Hosier*, 835 F. Supp. 2d at 1102 (citing *Kennecott Utah Copper Corp. v. Becker*, 195 F.3d 1201, 1204 (10th Cir.1999)) (emphasis added).

**B. Medical Center's Motion to Vacate Arbitration Award**

Invoking the manifest disregard standard, the Medical Center argues that the Arbitrator's award should be vacated because it does not "draw its essence" from the CBA and because the Arbitrator exceeded the issues submitted to him by the parties.

# 1. Whether Award "Draws its Essence" from the CBA

An award does not "draw its essence" from the collective bargaining agreement if

> It is contrary to the express language of the contract or is so unfounded in reason and fact, so unconnected with the working and purpose of the agreement as to manifest an infidelity to the obligation of the arbitrator or if viewed in the light of its language, its context, and any other indicia of the parties' intention, it is without factual support.

*LB&B Associates, Inc. v. International Broth. of Electrical Workers, Local No. 113*, 461 F.3d 1195, 1197-98 (10th Cir. 2006) (citation omitted).

The Medical Center contends that the award did not draw its essence from the CBA because:

- The Arbitrator ignored the plain language of the CBA when he found that the Grievant was not tardy in complying with the Charge Nurse's order to go to the suicidal patient's room.[5]

- The Arbitrator exceeded his authority when he found that the Grievant was not qualified to perform sitter duties and that the situation called for a licensed Certified Nurse Assistant.

- The Arbitrator exceeded his authority when he found that the patient's family members were qualified to act in the sitter capacity.

- The Arbitrator ignored the plain language of the parties' CBA when he found that the Grievant did not jeopardize a patient's safety.

- The Arbitrator exercised a function of the employer and interfered with the employer's ability to set standards of patient care when he found that "leaving the suicidal patient's hospital room twice [did not] jeopardize a patient's safety," and ordered reinstatement.

[Doc. 13 at 14-17].

However, the Arbitrator's conclusions are factual findings based on the evidence presented by the parties and the Medical Center's Sitter Policy, which the Grievant was charged

---

[5] In his decision, the Arbitrator acknowledged that pursuant to Article 3.1.8 of the CBA, the Medical Center retained the right to make decisions as to the scheduling of associates, number of shifts, and normal starting and stopping times. [Doc. 1-1 at 3].

13

with violating, and as a result, are beyond review. *Hosier*, *supra.*. For example, the Arbitrator pointed out that the Sitter Policy "specifically allows a family member, family friend, significant other, and/or domestic partner may sit with a patient," and noted that during the two short trips the Grievant made to get a blanket and water for the patient, family members were present in the room with the patient. [Doc. 1-1 at 17-18]. Additionally, the Arbitrator discussed the Medical Center's accusation that the Grievant was tardy in proceeding to the suicidal patient's room. *Id.* at 16-17. Ms. Hand testified the Grievant took 45 minutes to get to the hospital room. *Id.* The Grievant, though, testified that Ms. Hand told her to finish charts she was working on and then go to the patient's room, and that she arrived in the patient's room approximately ten minutes after being instructed to do so by Ms. Hand. *Id.* Ms. Hand also testified that the Grievant did not arrive at the patient's room until 5:30 p.m.—45 minutes after she had been ordered to be a Sitter. *Id.* However, the Vice-President of Human Resources testified that the computer records were unreliable and could not be used to verify the time the Grievant entered the suicidal patient's room. *Id.* The Arbitrator weighed the testimony and concluded the Grievant's testimony was more believable than Ms. Hand's. *Id.*

Similarly, the arbitrator, after hearing testimony of the Grievant and other witnesses, and in light of the Sitter Policy, made a finding of fact that the Grievant did not jeopardize patient safety by leaving the suicidal patient's room while her parents and significant other were in the room with her. *Id.* Finally, the arbitrator observed that pursuant to the Sitter Policy, the Sitter was required to complete nursing assistant duties and responsibilities with the patient, including a) vital signs; (b) activities of daily living (feeding bathing, toileting, ambulating, etc.); c) turning every two hours; and d) documenting vital signs, I&O's and activities. *Id.* at 17. He noted that in the two years the Grievant served as a Sitter prior to December 14, 2014, the employer never

14

trained her in the Sitter Policy and she had never been told that she was not allowed to leave the patient's room while she was on duty. *Id.*

The Medical Center has cited no evidence establishing that the Arbitrator's decision is contrary to the language of the contract, is "so unconnected with the working purpose of the agreement as to manifest an infidelity to the obligation of the arbitrator" or is "without factual support." *LB&B Associates, Inc.*, *supra.*

As previously noted, the arbitrator's factual findings are beyond review. *Hosier*, 835 F. Supp. 2d at 1102. Further, "so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling [the arbitrator] because their interpretation of the contract" differs. *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 (1960). Accordingly, the Court rejects the Medical Center's argument that the decision did not draw its essence from the CBA.

### 2. Whether the Arbitrator Exceeded the Issues Submitted by the Parties

Citing Article 26, Section 26.19.5 of the CBA, the Medical Center contends the award should be vacated because the Arbitrator exceeded the issues the parties submitted to him by addressing (1) whether the Grievant was qualified to be a sitter in a suicidal patient's hospital room, and (2) whether she jeopardized a patient's safety by leaving the suicidal patient's hospital room twice. Section 26.19.5 states:

> The Arbitrator shall have the authority to determine if there was just cause for any disciplinary action. However, in no case shall the Arbitrator have the power to add to, nor subtract from, or modify this Agreement, this Agreement, nor shall the Arbitrator substitute their discretion for that of the employer where such discretion has been retained by the employer, nor shall the Arbitrator exercise any responsibility or function of the employer, including but not limited to, the ability to set standards of patient care.

[Doc. 1-2 at 6].

15

In determining whether the Medical Center had just cause for terminating Grievant's employment, the Arbitrator properly examined the Medical Center's Sitter Policy. He also weighed the testimony of Grievant and Nurse Hand. [Doc. 1-1 at 16-20]. He noted that the Medical Center did not follow the policy, because the Grievant lacked the training or qualifications set out in the Sitter Policy. Additionally, based on the evidence presented, he found that the Grievant did not violate the Sitter Policy, because she timely followed Nurse Hand's directive to finish the files she was working on and then proceed to the patient's room, and she never left the patient alone in the hospital room. *Id.* Based on these findings, he concluded the Medical Center lacked just cause for terminating the Grievant, and he sustained the Grievance. *Id.* at 20.

Accordingly, the Court concludes the Arbitrator did not exceed the issues submitted by the parties.

### C. The Union's Petition to Confirm Arbitration Award

In its Petition to Confirm Arbitration, the Union asked the Court to:

- enter a judgment declaring that the Medical Center is obligated to comply with the Arbitrator's award and that the Medical Center has breached its obligation in failing and refusing to do so;
- order the Medical Center to comply with the award and make full back-pay restitution as directed by the Arbitrator, including pre-judgment interest on all wages and other monetary benefits due, and to reinstate the Grievant to her previous position;
- order the Medical Center to immediately reinstate the Grievant during the course of this litigation under a preliminary injunction;
- award the Union costs and reasonable attorney fees incurred in this action; and

16

- award such other relief as may be proper.

[Doc. 1 at 6].

The Court did not enter a preliminary injunction in this case. However, based on the Court's denial of the Medical Center's Motion to Vacate Arbitration Award, the Court concludes that the Union's remaining requests should be granted, and an injunction requiring the Medical Center to reinstate the Grievant should issue.

### III. CONCLUSION

For the foregoing reasons, **IT IS THEREFORE ORDERED THAT,** Defendant Christus St. Vincent Regional Medical Center's Motion to Vacate Arbitration Reward [Doc. 13] is **DENIED**; and Plaintiff District 1199NM, National Union of Hospital and Healthcare Employees, AFSCME, AFL-CIO's Petition to Confirm Arbitration Award is **GRANTED.** The Court hereby affirms the award of the Arbitrator; finds that the Medical Center is obligated to comply with the Arbitrator's Award and has breached its obligation in failing and refusing to do so; orders the Medical Center to pay full back-pay restitution as directed by the Arbitrator, including pre-judgment interest on all wages and other monetary benefits due, and to reinstate the Grievant to her previous position; and awards the Union costs and reasonable attorney fees incurred in this action.

**ENTERED** this 2nd day of August, 2018.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Shane Youtz, Stephen Curtice<br>YOUTZ & VALDEZ, PC<br>*Attorneys for Plaintiff* | Charles Birenbaum, Jamie R. Adams<br>GREENBERG TRAURIG LLP<br>*Attorneys for Defendants* |